Now, the first case on the docket this morning is 2-24-0452, D.C. Ranch, LLC, Illinois Limited Liability Company, plaintiff, Abilene, v. Lake County Zoning Board of Appeals, at AL Defendant's Palace, arguing on behalf of the appellant, Mr. Kwadwokalon Kwin-Nita, arguing on behalf of Abilene, Mr. Robert T. O'Donnell. All right. Are you both ready to proceed? Yes. Okay. Counsel, when you're ready. May it please the court, opposing counsel, to the justices, my name is Colin Comito. I'm an assistant state's attorney in Lake County. Recognizing that the court has read the briefs, has scoured the report of proceedings, has looked over the common law record, it's my intention to aim for brevity and some repetition, not redundancy. What I'd like to do is make a few statements about what the case is about, and then discuss and identify three points that are important for the court's consideration of this matter. This case is about a 47-acre parcel of land that sits in unincorporated Fremont Township. Zoned agricultural, farmed with crops since 1939, specifically corn. Deep Creek proposes to develop the property. It seeks to elevate the entire 47 acres by anywhere between, for our purposes, I'll say between 13 and 20 feet. Now, the way they're going to do that is by bringing outside fill to the property. Fill in the record is clay material, as testified by Mr. Rooney. But they'll first remove the topsoil and store the topsoil someplace. That's correct. To reapply it once the bulldozers compact the fill. Because, as was testified before the zoning board, the pasture grasses, which will take up, as identified by the testimony, the majority of the 47-acre parcel, can't grow on the fill, which is compacted clay. That development activity, justices will take, as testified to by Mr. Rooney, which is the expert for Deep Creek, a truck every 10 minutes. It would be 48 trucks a day, like 2.8 years to complete. 2.85 years, Monday through Friday, 5 days a week, 7 to 5. Now, in addition to this case being about those facts, from a legal perspective, it's about the zoning board performing its basic function within its province to review evidence and testimony provided at a hearing and make a determination based on evidence contained in a sufficiently developed record. Counsel, Deep Creek relies upon the Kendall County case. How do you respond to their argument that the ultimate purpose is not relevant as long as there's an agricultural component or use? So, the position of the defendants is that Deep Creek takes Kendall County out of context. And Kendall County actually stands for the proposition that this court in 1988 had significant foresight. And it envisioned this problem. It envisioned, when it was considering an injunction, seeing that proposed development activity could take on a character such that it would become industrial in nature and no longer serve the stated agricultural purpose. There's a problem with that in this matter. Kendall County was, I believe, on interlocutory appeal, sent the case back. There was no determination on the merits. This is a final order. And it is flat out, straight up, Deep Creek's position that the minute that they extract a declaration and an admission that is approved by the Zoning Board of Appeals, that the proposed development into an equestrian facility, the equestrian facility being as defined under Illinois law, an agricultural use of land, the minute that that statement is made, the board is immediately divested of all of its core regulatory powers. And any development activity, any development activity, not 428,000 cubic yards of fill, not 616 cubic yards of fill, but any amount of fill over any duration, in any scale, in any scope, they can do. That is squarely what is being asked of this court. The minute that it's stated, we can do anything. It seems that what the county is doing here is saying you're already beyond an agricultural use, right? Right at the beginning, based on these plans alone, in Kendall County versus Aurora National Bank, our courts said the county will know when, essentially, it exceeds the agricultural use and becomes. And did you look at the history of the Kendall County case? I did, Your Honor. And the second opinion from our court, because the General Assembly, after we denied the PFR, the Supreme Court denied the PLA, the General Assembly responded by eliminating from an agricultural purpose, removing sand, gravel, or limestone. That is not, and the county has the authority to regulate. Well, here there's no dispute that so long as it's an agricultural purpose, right, then, and the county's position is it's not, clearly, from the plans itself and the testimony before the zoning board. It's not. That's the county's position, right? That's correct. The development activity itself, viewing it for what it is, is based on the correct amount. Yes. It is of such magnitude, the volume of it, the duration of it, the scope of it, is of such magnitude that it is not in service of the stated agricultural purpose and, therefore, does not serve an agricultural purpose. Mr. Kameeda, can I ask you this question? Is it the position of the board that an equestrian center could be developed without the need of all of this dirt moving? Yes. And they say, well, we have to level the whole thing out. We have to make accommodations for the street. How could they do that without moving all of this dirt? How could they reach their goal? So the testimony that was provided by the experts on both sides, as well as other individuals before the board, was conflicting. And based on the conflicts in the testimony, the board just decided one over the other, which, based on this Court's deference, it's entitled to deference. Mr. Frank, who was on the side of the department, indicated that the land itself could be balanced such that it could be leveled, and all of the issues that were raised—erosion, drainage, visibility, attractiveness, and safety—could be addressed in that way. There was a disagreement as to the scope, 2 to 5 percent, and how that translates to the velocity of the water runoff, 1 percent. And the board just, frankly, decided one over the other, based on a sufficient factual record and conflicting evidence. So it was the board's position, based on what was provided, that it could be accomplished. And telling is the fact that the board accepted the notion, as testified to by Mr. Wagoner, that the land could benefit from some fill. It could benefit from fill, some fill, not the amount of fill at the scale, unknown duration, don't know where it's coming from over the course of time, did not accept that based on what it heard. I'd like to now turn— But is that not a zoning process? All of this fill—Mr. O'Donnell says that they're exempt from these permit requirements under Section 151. Are these two separate things, in other words? The asking for the zoning to build an equestrian center, and then everything else that goes along with it? Well, the relevant test to be applied is whether the proposed development activity is necessary in service of an agricultural purpose. And to undertake that consideration, you have to look at the facts like the board did and undertake the analysis. This is all about zoning, and it's all about the zoning board's power to regulate what they determined was industrial activity that was not in service of an agricultural purpose. Frankly, it was not necessary to achieve the equestrian facility. And that the justifications identified to supplant and provide the necessity that were provided by Deep Creek, those being there's erosion problems, there's drainage problems, there's safety and attractiveness problems. There are a whole host of problems, and they attempted to justify how the amount of fill could solve those problems. And it just was not accepted. And the board decided, based on its making of credibility determinations of individuals, the board can't, you know, the court can't substitute its view of the evidence in that respect for them. But it did determine, and Chair Koppen did state openly that he found there was zero evidence presented that would make him believe that an equestrian facility would ever be established on the property. And interestingly, the trial court had a similar concern when it stated, forgive me, plaintiff's presentation as to its equestrian operation has no site plan, no showing of roads through the property, and a stable drawing that appears to have come off the internet. Even a concept plan would have a little more detail or evidence of what the end project is going to look like if the plaintiff is truly intending to develop this property as an equestrian center. And why did you submit that they reversed the board, he reversed the board after making that statement? I am not entirely clear as to why the trial court, having made that statement, ruled as it did. But this court sits on administrative review, which is a unique position. It's not a direct appeal. It's not a de novo consideration. The court sort of hops over the trial court. Of course, it looks at what the trial court says and can look at what the trial court says. But it hops over it and gives deference to the administrative determination of the Zoning Board of Appeals. There's no reweighing the evidence. There's no credibility determinations. And frankly, if there's evidence to support the agency's finding, it really shouldn't be deserved. And this case presents that situation on a very basic level. The board didn't make a mistake. It just reviewed the evidence and decided accordingly. The standard of review is fairly erroneous, which is significantly deferential. And it requires this court to look at not sections of the appellate record, but the whole thing. And it should only reverse if it's left with a definite and firm conviction that a mistake was committed. Like, this was absolutely wrong based on the entire record. Well, it's not. And I'd like to say the board determined, quote, and this is on Appendix A-6 through A-10 of the opening brief, that the proposed fail grade activity is not, quote, a necessary component to the establishment of an equestrian facility. It made findings. In fact, specifically, a 1% grade would cause drainage to worsen, except that the grading should be between 2% and 5%. It said that the compacted clay, as proposed, would, quote, worsen the drainage. There was no business plan. There was no architectural rendings. The board used the term deceived, deception. The change in the amount of fill at the late stage from 600,000 to 428,000, they did not deem material. And they decided that Mr. Rooney was not credible as a result of a number of issues, including him making a traffic impact assessment without being a traffic engineer. And with that, let me ask you this. Perfect timing. One more question. In Kendall County, the records show that the beneficiaries of the trust were historically farmers. They owned and operated farms. Is there any evidence that any of the owners of Deep Creek are farmers or forest people? No. In fact, they're excavators. They're businessmen. And the expert that testified in support of the site plan, which he drafted, developed, and the individual who proposed the solutions to the erosion and the drainage problems, was a shareholder in Deep Creek. Those facts are relevant, and they shy away from what Kendall County also says, which you look to the proposed activity itself, not the intent of the businessmen, but they're businessmen. And that's a fact, and it's a relevant fact. Thank you. Any other questions? Any follow-up? Counsel, thank you. Thank you. Good morning, Your Honors. Counsel, what I want to start is with the findings of the director, which were confirmed or affirmed by the ZBA, and that is that based on the description of the property reflected on the site plan and the site plan is important because the site plan shows the existing grades before any filling and grading was done. It shows the finished grades after the proposed filling and grading was done, and then it shows the siting of the equestrian facility buildings, including the corral and the 23 acres of pasture land. And the director's determination was that site plan, that use, was an agricultural use. There was no finding, although there was, as counsel pointed out, there was some doubt on what the ultimate use would be, both by the trial court and the ZBA. There was no finding by anyone that the proposed agricultural use was a pretext for a clean-fill operation, none whatsoever. There was, I want to address, Justice Burkett, you made the comment in the context of a question is there was a determination by the director that this proposed use crossed the line was the phrase used. Mike, and I'm not answering a question with a question, where is the line? The question of when a use for agricultural no longer warrants the protection of the statute will depend upon the facts of each case. That's what the court said in McConnell County, and what the zoning board determined and the director determined was based upon the plans itself. It is not, it doesn't warrant the protection of the statute. Well, I don't think that's what they ruled. What they said was, and what the director testified to, is that in his opinion, it was too much fill. And it was in his opinion that the grade of the land could be a 2% grade as opposed to a 1% grade. Well, all that affects is the velocity at which stormwater will flow off the property and how much will be absorbed into the ground. The determination by the engineer that testified, the only engineer that testified, said that it's really better at 1% because that allows more water to percolate into the soil, less runoff. So not impact energy. Well, percolate into the soil, it's going to percolate into the clay, which is going to hold the water. It's going to percolate into the six inches of, six inches or more. Are you a farmer? Do you know much about farming? I'm certainly not a farmer, and I wouldn't pretend to know a lot about farming. Do you know how those depression areas serve the purpose of a farm? I do. And what do they do? And those depressional areas, they hold water, and they allow drainage, right? They do, but in this instance, we're talking about the amount of fill that will be brought to the site in order to do two things. That was the testimony. One, there were areas of significant erosion causing the soil to be pitted, and that needed to be filled in. The testimony was that the acres of pasture land could not serve their intended purpose in that condition. The county's counter to that was, from the expert that Mr. Wagner spoke with over the telephone, was to fence off those areas. Well, I suppose that's an option, but if you fence off and also tiling, installing drain tiles, that's correct, Your Honor, but those are alternatives. There was no testimony that grading the property to a one percent slope wouldn't efficiently move stormwater off the property and allow for stormwater to be percolated into the soil. My point in starting with the finding of the director is the fact that the county made no determination, nor did the ZBA, based on the evidence, that the proposed use wasn't an agricultural use. What the county did is really conflate, I believe, conflate zoning, and this is the questions that Justice Chostik raised with respect to zoning versus permitting. Zoning is land use. The grading and filling of a property is incident to a site development permit. That's, in this instance, when the zoning of the property is agricultural, and grading and filling is called for incident to that agricultural use, there is an exemption created, and the exemption is very simple. Any filling and grading incident to that agricultural use is permitted and not regulated, i.e., does not require a site development permit, as long as that filling and grading stays out of the regulatory floodplain. And there is no question here, no dispute, that all of this filling and grading was to occur outside of the regulatory floodplain. When the county then imposes, as the director did, a completely arbitrary, undefined determination that the amount of fill rose, which is not stated in the exemption, nowhere stated in the ordinance, where he determined that the amount of fill created what he labeled to be an interim use. That interim use, he then looked in the ordinance and said, well, there is no interim use in the zoning code for filling and grading of property. Of course not. That's governed by the site development permit process. So he then assigned, well, the filling and grading that's proposed here is most akin to warehouse and freight movement, which is a use in the ordinance. But it's not an agricultural. It's not an agricultural use. But first and foremost, there is no such thing as an interim use in the county's zoning code. And if we step back and ask ourselves how many developments require some degree of earthwork, filling and grading, I would suggest to the court that most, if not all, of any significance. There's no interim zoning for filling and grading incident to building a manufacturing facility, a residential development. Isn't it just not just the letter of the law, but don't we step back and not lose sight of the magnitude of the grading and filling here? Of course we do. Let me ask you this. You keep going back to the exemption. What's the standard of review here? I think the standard of review is clearly erroneous. So we're not interpreting the application of the ordinance? Oh, I think we do have to. Wouldn't that be de novo review? Well, I think we have to look at the ordinance because we have an ordinance that provides for an exemption for agricultural uses for very obvious and beneficial purposes, which I won't get into. Why do we have the agricultural exemption? You can't have the agricultural exemption and make those that are pursuing agricultural uses not have to go through the site development permit process. So what you're saying, Mr. O'Donnell, is the only reason he went before the board was to determine whether it was agricultural or not, and then everything else flows through the permit portion. So those shouldn't have considered anything else? In the first instance, that was the application. The application is for a determination that the proposed use is an agricultural use. And in order to cause that finding to occur, a site plan had to be submitted, information had to be submitted, which demonstrates what the use is going to be, how it's going to be achieved, what it's going to require. All of that was done. The county had every opportunity, and this is where Kendall County becomes important, and I'm going to pause. Your Honor, do you have a question for me? I do have a question. Go ahead. Finish your Kendall County comment. Okay. Well, what I was going to say is that's where Kendall County comes into play. When you say Kendall County, the first Kendall County or the second? Kendall County won. Okay. Where Kendall County comes into play is that the court did acknowledge that, yes, there could be this exemption, and you could lose that exemption depending on what that use looks like. And in that case, they weren't building it up. They were digging it down. But the court used the example of, now, in this instance, if they had dug a quarry and put a lake at the bottom of the quarry to use to irrigate the sod, that could have justified a finding that the agricultural use really is inappropriate, so secondary to the mining operation that the exemption wouldn't apply. The county didn't make that finding there. The county didn't make that sort of finding here. There was no finding here by the director that the proposed use, the agricultural use, was a pretext for a clean fill operation. It didn't occur. They could have made that finding, but they didn't. All the director ever really said was, well, I think the fill is too much. How much? He didn't. There's no definition even in the record of how much fill was beyond the can, if you will. None whatsoever. He could have done that. What he did was he moved in the direction of saying, well, I'm going to call it a separate use requiring zoning. Now I'll ask my question. Okay. Okay. Let's talk about what Justice Jorgensen touched upon, which is our reading of the exemption. The development permit is not required for agricultural practices outside the regulatory floodplain that involve filling or grading, including but not limited to construction of levees, terraces, and surface water diversions that are a part of the Natural Resource Conservation Service design and approved construction project. Is this or was this part of a Natural Resources Conservation Service? No. Doesn't that include that modifies everything that's in that provision? No. That argument was actually made to the trial court, and it was summarily rejected, and it wasn't even pursued in the appeal. I'm asking you the question. I'm saying that's the reading of it. Doesn't that qualify the entire list? And the answer is, the simple answer is it does not. Why? Because the language is clear that you're talking here about that is a secondary, that is another way in which one can achieve the exemption. By applying for and receiving an NRCS designation. And that's additive. That could occur. That could be the route that a landowner goes to. But it says levees, terraces, and surface water diversion that are a part of Natural Resource Conservation Service. The key phrase, Your Honor, is including but not limited to. That's the phrase that's key to the interpretation of that exemption. It's agricultural practices outside of the regulatory floodplain that involve filling or grading. Including but not limited to. So getting an NRCS permit or designation could be a way to achieve the exemption. But first and foremost, as applied here, it's the agricultural practice outside the regulatory floodplain that involves filling and grading. Reading it as a whole, that provision is meant to exempt from permitting requirements those activities that are relatively minor. This is a major project. I wouldn't dispute the fact that it's a major project, but I don't see any reference in this exemption, Your Honor, that identifies major versus minor, let alone, how does a landowner know major versus minor? How does the county know major versus minor? Who determines major versus minor? The county's uncertainty is not the court's. It's up to the representatives that enforce the statute, including the board, correct? But those representatives that enforce the statute who are responsible for, as found by Judge Smith, that prepared this. This is not a new issue. And this exemption is broad. This exemption doesn't have any of the qualifiers of major versus minor, a lot versus a little, let alone to allow that determination to be made, as testified here by the director, by him and him alone. And how is a landowner supposed to know that they need that determination of major versus minor or a lot versus a little? The testimony was they would have to know to come and ask the director. That simply, and this was found by the trial court, that's simply so arbitrary such that it implicates due process rights. The county had the opportunity here, not only the obvious is to redefine or better define their own exemption, but more importantly, as applied to this particular issue, there was the opportunity of the county to make a finding, to make an explicit finding that this was too much, this crossed the line, that this was a pretext for a clean fill operation. They didn't. What about the safety concerns? Safety concerns with respect to? The trucks, the number of trucks, the number of years it's going to take. I think the new plan was 2.85 years, right? That's correct. And then again, that makes certain assumptions as to the quantity per year, the quantity per year, but approximately that was the testimony, Your Honor. You're right. But the safety concerns, the county has the ability to regulate those safety concerns, whether it's the IDOT or the county, who's over what system they're on. I don't want, I want to answer the question, so as part of, it's not part of this record, but that's been addressed by the trial court in this matter because the operation is ongoing, and all of those issues were done. There is definition given to when we can, what the point of ingress and egress for the road is, how often the road has to be cleaned of debris, which is daily, how many trucks, where the trucks go. So my point is that, yes, those are concerns, but they're not addressed in this particular process. And in fact, in this specific case, while this operation is ongoing, they have been addressed. Satisfactory to all of us. Which, of course, is not in the record. I did make that qualification, but I wanted to answer the question, Your Honor. Any additional questions? Thank you. Counsel, when you're ready, you reply. To the Justices, I'd like to briefly address a few points. To Justice Jorgensen's point about the standard of review, standard of review is clearly erroneous, and the Court is sitting on administrative review. Now, Deep Creek indicates that it agrees that the standard of review is clearly erroneous. However, it has asked the Court flat out, no questions, no ifs and or buts, to make a de novo determination that a declaration by the Director that an equestrian facility serves an agricultural purpose that was later accepted by the Board is sufficient to immediately and automatically divest the Zoning Board of all of its regulatory powers. Meaning, the minute that that is done, it's all over. No need for a hearing, no need for fact-finding, because any activity, any development activity, in any duration, in any scope, any volume, can be conducted outright. Is that what he said, though? Is that what Mr. O'Donnell said? I mean, didn't he say that, okay, you have a floor in equestrian, which is agricultural, and then the permitting process would take everything else into consideration? So the permitting process is part and parcel of the zoning power of the Board and its ability to regulate industrial activity, activity it deems not necessary to serve an agricultural purpose and be industrial. Now, what was indicated and what is flat out asked of this Court, and Deep Creek turns the Court's attention to the UDO, which starts with the words, agricultural practices, agricultural practices. Is it an agricultural use of land? Is it an agricultural practice? It says... One moment. One moment. That it can undertake any development activity with, quote, no caveats in volume or time limitations, and with no requirement that filling and grading be necessary for the proposed agricultural use. It's the defendant's position that that's frankly just not the law. With respect to the interim use statement, just because Mr. Wagner made this statement to the Board doesn't mean that the Board accepted it, and the Board, in fact, did not accept it. Didn't believe there would be any interim use because it didn't believe that the ultimate equestrian facility would ever be achieved. I'd like to turn the Court's attention to Mr. Rooney's testimony about the duration of the proposal. Chairman Koppen asked, quote, so they want a horse facility, but they don't know when they want to open the horse facility? Mr. Rooney states, quote, we would like to do it as soon as we can get the fill. In the record, there's no indication as to where they would get the fill. They indicated that they didn't know where they would get the fill, which directly translates to duration. How can Mr. Rooney make a determination about the duration of the project that is in any way credible if he doesn't know where he's going to get the fill? He did indicate a truck every 10 minutes, 48 trucks a day for 2.8 years. But an expert's opinion is only as good as the basis offered for it. And what's the basis for 2.8 years? Bottom line, Deep Creek is asking the Court to rule that the Corps' zoning power of the Board can be easily divested, allowing individuals who are not farmers to undertake unfettered industrial activity in any way, in any duration, in any scope, and in any volume. But Deep Creek's position is that they should make their own determination as to how much fill is necessary and not the Director. They did make... The Director acknowledged that filling is going to be necessary in order to convert it to an equestrian center, right? Some, not as much as was proposed. And that determination is deserving of this Court's deference. Thank you very much. Thank you very much, Your Honor. All right, we will be in recess until the next argument at 10.30. Thank both counsel for excellent arguments this morning. All rise.